IT IS HEREBY ADJUDGED and
DECREED this is SO ORDERED.

*The party obtaining this order is responsible for noticing it pursuant to Local Rule 9022-1.*

Dated: March 12, 2013

*Randolph J. Haines*

**Randolph J. Haines, Chief Bankruptcy Judge**
_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Chapter 11 |
| MORTGAGES LTD., | CASE NO. 2:08-bk-07465-RJH |
| Debtor. | |
| BEAR TOOTH MOUNTAIN HOLDINGS LIMITED PARTNERSHIP, an Arizona limited liability partnership; AJ CHANDLER 25 ACRES, LLC, an Arizona limited liability company, CORNERSTONE REALTY & DEVELOPMENT, INC., an Arizona corporation; CORNERSTONE REALTY & DEVELOPMENT, INC. DEFINED BENEFIT PLAN AND TRUST, an Arizona trust; EVERTSON OIL COMPANY, INC., a Utah corporation; JAMES C. SCHNECK REVOCABLE TRUST DATED OCTOBER 1, 1999, a Wisconsin trust, James C. Schneck, trustee; LONNIE JOEL KRUEGER FAMILY TRUST, an Arizona trust, Lonnie J. Krueger, trustee; BRETT MICHAEL McFADDEN an unmarried man; MICHAEL JOHNSON INVESTMENTS II, L.L.C., an Arizona limited liability company; LOUIS B. MURPHEY, an unmarried man; MORLEY ROSENFIELD, M.D. P.C. RESTATED PROFIT SHARING PLAN, an Arizona trust, Morley Rosenfield, trustee; PUEBLO SERENO MOBILE HOME PARK L.L.C., an Arizona limited liability company; QUEEN CREEK XVIII, L.L.C., an Arizona limited liability company; WILLIAM L. HAWKINS FAMILY L.L.P., an Arizona limited liability partnership; L.L.J. INVESTMENTS, LLC, an Arizona limited liability company, | ADVERSARY NO. 2:12-ap-01849-RJH<br><br>OPINION AND ORDER DENYING MOTION TO REMAND |
| Plaintiffs, | |

| | |
|---|---|
| v. | )<br>) |
| ML MANAGER LLC, an Arizona limited<br>liability company, MARK WINKLEMAN;<br>BRUCE EDKIN and TAYLOR EDKIN;<br>DAVID FIELER and JANE DOE FIELER;<br>ELLIOTT POLLACK and CATHY POLLACK;<br>KAREN EPSTEIN and SHELDON EPSTEIN;<br>SCOTT SUMMERS and JANE DOE<br>SUMMERS,<br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Plaintiffs' motion to remand argues that a state court lawsuit against a liquidating trustee over the manner in which it liquidated the estate assets is so unrelated to the bankruptcy case and the liquidating plan of reorganization that there is no federal bankruptcy jurisdiction to hear the suit in federal court. This Court finds, to the contrary, that the requisite close nexus exists and therefore denies the motion to remand.

## I. Factual and Procedural Background

### A. The Debtor, Its Business, and Its Investors

Mortgages Ltd. was in the business of making hard money commercial loans of money raised from its investors. Many investors' funds were pooled. The Debtor used those pooled funds to make loans, but also frequently transferred pooled funds from one loan to another, without notice to or specific authority from the investors. The pools, known as MP Funds, held undivided fractional interests in the loans and promissory notes so financed and in the collateral held for those loans, usually deeds of trust. Other investors were allowed, by agreement, to specify exactly the loans in which their funds would be invested. Such investors then held their own undivided fractional interests in that promissory note and the accompanying collateral. Such investors were called "pass through investors," and one of the programs created for such investors was called the Revolving Opportunity ("Rev Op") program. All of the Plaintiffs in this action are Rev Op pass-through investors.

According to the Complaint, as of the petition date the Rev Op Plaintiffs owned pass-through investments with principal balances of approximately $183 million; other pass-

2

through investors held approximately $124 million principal balance of investments; and fund investors held principal balance investments of approximately $400 million.

Although the Rev Op pass-through investors could dictate the loan in which their money was invested, the Rev Op investments were not the sole investors in any one loan. Rather, the Rev Op investments comprised only a portion of any particular loan, and sometimes a minority portion, with the balance of that loan being held by the various funds or pools, and possibly by other pass-through investors that were not in the Rev Op Group.

Mortgages Ltd. continued to make such loans even after a serious decline in Arizona's real estate market, and ultimately committed to more loans than it could fund. Its CEO, the son of the founder, committed suicide in June, 2008. Some borrowers whose loans were unfunded filed an involuntary bankruptcy petition within a couple of weeks thereafter, and the involuntary case was later converted by Debtor into a voluntary Chapter 11. The Chapter 11 estate consisted of an approximate $1 billion loan portfolio, but less than 10% of those loans were performing.

**B. The Pre-Confirmation Battle For Control of the Bankruptcy Case and Liquidation**

It quickly became clear the case would be a liquidating Chapter 11. The Debtor could not continue its ordinary course of business, nor possibly reorganize that business, simply because no investors would invest any new money for the Debtor to lend. Indeed, the Debtor had run out of money to lend even before the bankruptcy case was filed. So the only "business" of the Debtor was to collect on the outstanding loans that could be collected, and to foreclose on the collateral securing defaulted loans and then ultimately liquidate that collateral.

Until a plan was confirmed, the bankruptcy case was largely a battle over who would control the inevitable liquidation. The Debtor remained in possession and obtained its own counsel and financial advisor and even some interim financing. In addition an official creditors' committee was appointed, as well as an official "investors'" committee to represent those who had invested money in the loans originated by Mortgages Ltd. In addition, the petitioning creditors, who were actually borrowers, moved for appointment of a trustee, which

3

was opposed by various parties.

The battle for control extended to who could file a plan of reorganization, even though it was clear any plan would be a liquidating plan. Under the Bankruptcy Code the debtor-in-possession initially has a period of time in which it has the exclusive right to file a plan per 11 U.S.C. § 1121(b). In December, 2008, three parties – the Debtor, the Radical Bunny Group of investors, and the official investors' committee – stipulated to extend the Debtor's exclusive right to January 6, which was subsequently extended by agreement to January 12. When the Debtor failed to file a plan within that time, the investors' committee filed a liquidating plan on January 21, 2009, and then a first amended plan on March 13, 2009. Extensive negotiations then ensued, and various settlements and stipulations. Numerous objections were filed, including objections by some or all of the Plaintiffs, before the Court held trial on confirmation in May, 2009. Only at that time did Debtor file a competing plan. Although exclusivity had expired so any party in interest could file a plan, none of the Plaintiffs filed a plan.

### C. Confirmation of the Plan

Ultimately a two day trial was held on confirmation of the investor committee plan, to which the "Rev Op Group," consisting of many if not all of the Plaintiffs, objected. After taking the matter under advisement, the Court confirmed the investor committee plan by Order entered on May 20, 2009. The 17 page Confirmation Order made numerous findings of fact and conclusions of law, and incorporated many of the settlements that had been reached. In particular, ¶ U(3) of that Order modified § 4.13 of the Plan, addressing how certain "opt-out pass-through investors," which includes most if not all of the Plaintiffs herein, would be "assessed their proportionate share of costs and expenses of [servicing] and collecting the ML loans in a fair, equitable and nondiscriminatory manner." That change and that language had been specifically negotiated with the Plaintiffs, and as a result of that change the RevOp Group Plaintiffs withdrew their pending objections to confirmation. By the time the Court confirmed the plan, the only remaining outstanding objection was that of the Debtor, Mortgages Ltd.

4

The Plan created a separate Loan LLC for every loan being collected and serviced by the Debtor, created ML Manager LLC to be the manager of each such Loan LLC, and transferred to the respective Loan LLC the Debtor's interests in the respective Note and Deed of Trust for that loan. For the undivided interests in that Note held by pass-through investors such as the Plaintiffs, the Plan also assigned to and vested in ML Manager the same agency rights that the Debtor had held to administer and service that Note interest.

To pay for the administrative expenses of the bankruptcy and also to pay for the costs of ML Manager's operations to service the loans until they could generate enough proceeds to pay for their own administrative costs, the Plan contemplated that ML Manager would obtain approximately $20 million in Exit Financing. As noted above, the Confirmation Order specifically modified section 4.13 of the Plan to provide how the cost of the Exit Financing would be assessed proportionately among the Loan LLCs and among the pass-through investors.

### D. Post-Confirmation Liquidations and Objections

The Exit Financing was obtained and ML Manager undertook the servicing and liquidation of the loans. Since most of the loans were nonperforming, in most cases this meant foreclosing on the collateral securing the loan, and then liquidating that collateral.

Almost immediately after confirmation of the Plan the Rev Op Group filed a motion seeking clarification as to whether the pass through investors would be charged a share of the exit financing cost, and when and how that charge-back would occur. After extensive briefing and argument, the Court issued a Clarification Order on October 21, 2009, holding under the Plan, pass-through investors would be charged a "fair, equitable and proportional" share of the exit financing, and that ML Manager would assess that charge back at a time and in a manner selected by the exercise of its "business judgment."

The Rev-Op Group of pass-through investors began objecting to virtually every liquidation proposed by ML Manager. When ML Manager found a buyer for collateral it had foreclosed upon, it submitted its proposed sale to a vote of the investors whose interests had

5

been contributed to the Loan LLC, both fund investors and pass-through investors who agreed to contribute their interests. This vote process was required by the Plan, and was the principal benefit obtained by pass through investors contributing their interests to the Loan LLC. If the vote was favorable (and all have been to date), ML Manager then brought a motion for bankruptcy court approval of the sale, also pursuant to the Plan.[1]

For almost every sale of property in which the Plaintiffs had an interest, the Rev-Op Group objected to ML Manager's sale motion. In all cases the essence of the objection was that there should be no current sale because the sale was occurring in a down market; instead, the Rev Op Group argued that ML Manager should continue to hold the property until the market improved. In all of these situations the Court held a hearing and heard the objection, and ultimately overruled the objection and approved the sale. Almost all of those orders approving sales were appealed by the Rev Op Group and, so far as this Court is aware, every one of those appeals has resulted in the sale being affirmed by the appellate court (usually, if not always, the District Court for the District of Arizona).

The Rev Op Group also filed a declaratory judgment action seeking a declaration that ML Manager lacked agency authority to service and administer the interests of the pass-through investors. The Bankruptcy Court concluded by Order entered in July, 2010, that undisputed facts demonstrated that ML Manager did have such agency authority, and that it was coupled with an interest and so the agency authority could not be terminated by the election of the pass-through investors. That decision was appealed to the District Court, which affirmed in February, 2012. The District Court's affirmance is currently pending a further appeal to the Ninth Circuit.

---

[1] Each such motion made clear that it was <u>not</u> brought pursuant to the Bankruptcy Code's procedure for a debtor in possession to sell property outside the ordinary course of business, 11 U.S.C. § 363, but rather pursuant to the Plan's provision for bankruptcy court approval of a post-confirmation sale and liquidation, which was apparently intended primarily to provide investors with an opportunity to object if they had reason to believe the sale was not sought according to ML Manager's business judgment.

6

Case 2:12-ap-01849-RJH    Doc 49    Filed 03/12/13    Entered 03/13/13 10:05:13    Desc
Main Document - Motion to Remand    Page 6 of 12

Finally, when ML Manager presented an extremely detailed accounting and formula for exactly how the Exit Financing would be apportioned among the Loan LLCs and the opt-out pass-through investors, the Rev Op Group objected. The Bankruptcy Court heard and overruled the objection, and the Rev Op Group appealed that approval. On appeal the District Court affirmed all of the Bankruptcy Court's legal conclusions, but remanded for the Rev Op Group to present evidence as to any alleged errors in the calculation of how certain costs had been allocated. When given the opportunity for that evidentiary hearing, the Rev Op Group indicated it had no such evidence to present, so the Bankruptcy Court reaffirmed its prior ruling upholding the cost allocation formula and accounting.

### E. The Rev Op Group's State Court Complaint

Having lost both the Bankruptcy Court determinations and the associated appeals establishing that (1) ML Manager had agency authority, pursuant to the confirmed Plan, to liquidate all the loans, including the pass-through investors' interests in them, (2) all proposed sales were adequately marketed and within both the business judgment and agency authority of ML Manager and should be approved, and (3) the pass-through investors had been fairly and proportionately allocated their appropriate share of the Exit Financing, the Plaintiff pass-through investors filed this action in Maricopa County Superior Court, over three years after the Plan had been confirmed. The Defendants are ML Manager and the individual members of its Board of Directors.

The complaint asserts a number and variety of state or common law torts that are generally of two kinds: misrepresentation (Counts 4, 5 and 6) and breach of fiduciary duty (Counts 1, 2, 3, and 8). More important for present purposes, however, is not the nature or origin of the legal theories asserted but the facts and acts complained of. The prolix complaint is most easily understood when those facts and acts are summarized into a few broad categories. Basically, these categories are: (1) how the Plan was drafted, negotiated, amended and ultimately confirmed (paragraphs 79 - 162); (2) how the Exit Financing was obtained, used and allocated (paragraphs 163 - 177; 208 - 275; and 354 - 381); (3)how the ML Managers

7

Board of Directors operated internally (paragraphs 178 - 207); (4) how collateral was liquidated and sold, generally characterized as "fire sales" allegedly necessitated by an allegedly undisclosed default in the repayment of the Exit Financing (paragraphs 276 - 319); and (5) the assertion of agency authority assigned to ML Manager by the Plan (paragraphs 320 - 353).

ML Manager and the individual director defendants removed the Superior Court action to this Court. Plaintiffs have moved to remand, primarily on the argument that this action is not sufficiently "related to" either the Plan or the bankruptcy case for this Court to have jurisdiction pursuant to 28 U.S.C. § 1334(b).

## II. Analysis

In *Pegasus Gold*,[2] the Ninth Circuit expressly adopted the "Third Circuit's 'close nexus' test for post-confirmation 'related to' jurisdiction [as announced in *Resorts International*[3]] because it recognizes the limited nature of post-confirmation jurisdiction but retains a certain flexibility, which can be especially important in cases with continuing trusts."

Neither the Ninth nor the Third Circuit has attempted to define "close nexus." Both circuits have indicated that it is "more limited" or "narrower" than pre-confirmation related-to jurisdiction for which both circuits have adopted the *Pacor* test that is based on "any effect on the estate being administered in bankruptcy."[4] But while it may be true that the "close nexus" test is narrower or more limited in the sense that it ultimately yields a smaller number of cases for which bankruptcy jurisdiction exists, it is not narrower or more limited in the sense of yielding a subset of the cases that would satisfy the *Pacor* test. As this Court has previously

---

[2] *Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005).

[3] *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166-67 (3d Cir. 2004).

[4] *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984), quoted in *Fietz v. Great W. Sav. (In re Fietz)*, 852 F.2d 455, 457 (9th Cir. 1988).

8

noted,[5] the close nexus test is broader than the *Pacor* test in that it results in bankruptcy jurisdiction existing for some cases that would not satisfy the *Pacor* test. The two principal examples of situations where bankruptcy jurisdiciton exists notwithstanding the lack of any effect on the estate are jurisdiction to enter judgment on a nondischargeable debt, which can only be enforced against non-estate assets, and post-confirmation jurisdiction when a bankruptcy estate has ceased to exist in the formal, technical sense.

Given the lack of any definition of what "close nexus" means, it may be that "nexus" is simply another term used by some courts to refer to the statutory requirement of being "related to," with an emphasis that the relationship must be "close" rather than attenuated. But the term still does not identify what it is that must have this close relationship, except that the *Pegasus Gold* and *Resorts International* opinions make clear that it is not necessarily a relationship to the estate. Indeed, in *Pegasus Gold* the Ninth Circuit specifically noted that the mere fact that "the action could conceivably increase the recovery to the creditors" is, by itself, an insufficient justification for bankruptcy jurisdiction.[6]

If "nexus" is simply another term for "relationship," then the best source for a definition of the requisite relationship is the functional definition supplied by the Supreme Court in the highly analogous context of supplemental jurisdiction -- matters that would logically be litigated as a single litigation unit because they derive from a "common nucleus of operative facts."[7] Such a test focuses on the facts and acts complained of, rather than on either the legal theory the complaint seeks to apply to those facts or the results that would be obtained. The *Pegasus Gold* and *Resorts International* "close nexus" label (since it is apparently neither a test nor a definition) clearly points in this direction. Although the term has

---

[5] *Nat'l Retail Dev. Partners I, LLC v. Maness (In re Mortgages, Ltd.)*, 399 B.R. 673, 677-78 (Bankr. D. Ariz. 2008), *aff'd on other grounds*, 436 Fed. Appx. 739 (9th Cir. 2011).

[6] *Pegasus Gold*, 394 F.3d at 1194 n.1.

[7] *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966), quoted in *Pegasus Gold*, 394 F.3d at 1195.

9

not been defined by either Circuit, both have held that "matters affecting 'the interpretation, implementation, consummation, execution, or administration of the confirmed plan will typically have the requisite close nexus.'"[8] And the specific claims that the Ninth Circuit held to satisfy "close nexus" in *Pegasus Gold* would also satisfy the *United Mine Words v. Gibbs* formulation -- breach of the plan and a settlement agreement the plan implemented; breach of the covenant of good faith and fair dealing with respect to settlement agreements incorporated in and implemented by a plan; and fraud in consenting to confirmation of the plan.

Here, the facts and acts complained of do all concern the "interpretation, implementation, consummation, execution [and] administration of the confirmed plan." The essence of the complaint is all about how the collateral has been liquidated, which the Plaintiffs complain is by "fire sales," and how the costs of both the bankruptcy case and the subsequent liquidations have been incurred and allocated proportionately among the investors. These are all facts concerning the implementation, consummation, execution and administration of the plan. So are the complaints about ML Manager's decision making processes and information sharing, because these structures and requirements were all dictated by the plan. And management of the liquidation was what all of the bankruptcy litigation was all about.

Plaintiffs' motion to remand makes no argument tending to show that the essence of the complaint is something *other than* how the plan was negotiated and has been interpreted, implemented and executed. Nor does it make any argument to dispel the conclusion that what Plaintiffs complain of is something that does not arise from a common nucleus of operative facts that were, or should have been, addressed in either the plan itself or in the confirmation process, and thus should have been litigated as a single litigation unit. Indeed, most if not all of what Plaintiffs complain of actually *was* litigated in the plan confirmation process -- including the makeup of ML Manager's Board; ML Manager's duty and authority to liquidate the loans and the collateral; ML Manager's assigned agency authority

---

[8] *Pegasus Gold*, 394 F.3d at 1194, quoting *Resorts Int'l*, 372 F.3d at 167.

10

Case 2:12-ap-01849-RJH    Doc 49    Filed 03/12/13    Entered 03/13/13 10:05:13    Desc
Main Document - Motion to Remand    Page 10 of 12

over pass-through investors' interests; the process for voting and approval of sales; and the use and allocation of the Exit Financing. Instead of showing how their complaints do not relate to the interpretation, implementation and execution of the plan, the Plaintiffs merely argue that their legal theories assert state law claims, that some of the conduct complained of occurred post-confirmation, and that an estate no longer exists. But none of these arguments has any bearing on the adopted close nexus rule for post-confirmation jurisdiction, which does not hinge on a federal law basis for the claims, and which does not depend on the continued existence of an estate.

Moreover, it may also be significant to note that this is a liquidating plan, and the essence of the complaint is not a liquidating trustee's pursuit of pre-petition claims, but rather the fact and manner of the liquidation of what were estate assets. The Ninth Circuit has clearly indicated that a need for greater flexibility is especially important in the context of a liquidating plan.[9] In part this is because a liquidating trust created by a plan will necessarily maintain a close connection to the bankruptcy case and the plan even after the plan is confirmed, unlike a rehabilitated debtor who engages in new business post confirmation. It is also because when all the post confirmation entity does is to liquidate what had been estate assets, there is both less risk of extending jurisdiction to post confirmation business and a greater need to provide "an efficient forum in which to wind things up expeditiously."[10] While it is true that the liquidating nature of the plan, by itself, may be insufficient to demonstrate a sufficiently "close nexus" for the liquidating entity to pursue state law, pre-bankruptcy claims that could have as easily been filed in state court (such as the pre-confirmation claims that ML Manager asserted against the debtor's pre-petition lawyers and accountants[11]), that analysis has

---

[9] *Pegasus Gold*, 394 F.3d at 1194 (we adopt the "close nexus" test because its flexibility "can be especially important in cases with continuing trusts").

[10] *Calvert v. Zions Bancorporation (In re Consol. Meridian Funds)*, 485 B.R. 604, 614 (Bankr. W.D. Wash. 2013).

[11] *ML Servicing Co., Inc. v. Greenberg Traurig, LLP*, No. CIV11-0832-PHX DGC, 2011 WL 3320916 (D. Ariz. Aug. 2, 2011).

11

no bearing where the complaint concerns the implementation of the plan and the method of liquidation adopted by the liquidating entity as authorized by the plan.

### III. Conclusion

The Court therefore finds and concludes that the complaint concerns the interpretation, implementation, consummation, execution and administration of the confirmed plan, and that it satisfies the *Pagasus Gold* "close nexus" test for the existence of "related to" jurisdiction pursuant to 28. U.S.C. § 1334(b). The Court therefore denies the motion to remand for an alleged lack of jurisdiction.

The Court also finds and concludes that there is no equitable reason to remand and therefore denies the motion to remand pursuant to 28. U.S.C. § 1452(b).

Plaintiffs' motion to remand is denied.

DATED AND SIGNED ABOVE

12